1  **GREENBERG TRAURIG, LLP**
   Michael A. Nicodema (*pro hac vice*)(nicodemam@gtlaw.com)
2  David M. Joyal (*pro hac vice*)(joyald@gtlaw.com)
   200 Park Avenue, P.O. Box 677
3  Florham Park, New Jersey 07932
   Telephone: (973) 360-7900
4  Facsimile: (973) 301-8410

5  Jeffrey K. Joyner (SBN 180485)(joynerj@gtlaw.com)
   Jeffrey F. Yee (SBN 193123)(yeej@gtlaw.com)
6  2450 Colorado Avenue, Suite 400 East
   Santa Monica, California  90404
7  Telephone: (310) 586-7700
   Facsimile: (310) 586-7800

8  Attorneys for Plaintiff
   Ultra Products, Inc.
9

10                    **UNITED STATES DISTRICT COURT**

11                   **NORTHERN DISTRICT OF CALIFORNIA**

12                      **SAN FRANCISCO DIVISION**

13

14  Ultra Products, Inc.,                    CASE NO. 09-CV-04255 RS

            Plaintiff,                       **HONORABLE RICHARD SEEBORG**
15
    vs.
16                                           **PLAINTIFF ULTRA PRODUCTS, INC.'S**
    Antec, Inc., Channel Well Technologies Co.  **OPENING CLAIM CONSTRUCTION**
17  Ltd., E-Power Technology/PCMCIS, Enermax **BRIEF**
    Technology Corp., Enermax USA Corp., FSP
18  Group USA Corp., Magnell Associate Inc.  Complaint filed: April 4, 2008
    d/b/a ABS Computer Technologies Inc.,    Claim Construction Hearing: August 11, 2010
19  Mushkin Inc., Newegg Inc., Sea Sonic     Trial Date: TBD
    Electronics Co. Ltd., Sea Sonic Electronics
20  Inc., SPI Electronic Co. Ltd. d/b/a FSP Group
    Inc., Tagan Technology Co., Thermaltake
21  Technology Co. Ltd., Thermaltake Inc.,
    Topower Computer Industrial Co. Ltd., and
22  Topower Computer (USA) Inc.,

23          Defendants

24

25

26

27

28

1  Antec, Inc., Channel Well Technologies Co.
Ltd., E-Power Technology/PCMCIS, Enermax
2  Technology Corp., Enermax USA Corp., FSP
Group USA Corp., Mushkin Inc., Sea Sonic
3  Electronics Co. Ltd., Sea Sonic Electronics
Inc., SPI Electronic Co. Ltd. d/b/a FSP Group
4  Inc., Tagan Technology Co., Thermaltake
Technology Co. Ltd., Thermaltake Inc.,
5  Topower Computer Industrial Co. Ltd., and
Topower Computer (USA) Inc.,

6            Counterclaimants,

7  vs.

8  Ultra Products, Inc.,

9            Counterclaim Defendant

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF ULTRA PRODUCTS, INC.'S OPENING CLAIM CONSTRUCTION BRIEF

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   THE INVENTION OF THE '293 PATENT ........................................................ 1

III.  THE '293 PATENT CLAIMS AND TERMS IN DISPUTE .............................. 4

IV.   ARGUMENT ....................................................................................................... 7

    A.   The Principles Of Claim Construction ...................................................... 7

    B.   The Proper Construction Of The Disputed Claim Elements ..................... 8

        1.   The Preamble Of Claims 1, 4 And 7 Is A Claim limitation .......... 8

        2.   *"personal computer"* (Claims 1, 4, And 7) ................................... 9

        3.   *"personal computer power supply"* (Claims 1, 4, And 7) ........... 12

        4.   *"directly mated"* (Claims 1, 4, And 7) ....................................... 13

        5.   *"a plurality of component cables"* (Claims 1, 4 And 7) ............. 14

        6.   *"socket"* (Claims 1, 4, And 7) .................................................... 16

        7.   *"DC output sockets"* (Claims 1 And 4) ...................................... 17

        8.   *"plug"* (Claims 1, 4, And 7) ....................................................... 17

        9.   *"DC output cable plug"* (Claim 7) .............................................. 17

        10.  *"DC output plug"* (Claims 4 And 7) ........................................... 18

        11.  *"DC output cable socket"* (Claim 7) ........................................... 18

        12.  *"DC output cable plug or cable socket"* (Claims 4 And 7) .......... 18

IV.   CONCLUSION .................................................................................................. 19

i

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
   289 F.3d 801 (Fed. Cir. 2002) .................................................................... 7, 9

*Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*,
   34 F.3d 1048 (Fed. Cir. 1994) ........................................................................ 8

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
   327 F.3d 1364 (Fed. Cir. 2003) ...................................................................... 8

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995),
   *aff'd*, 517 U.S. 370 (1996) ............................................................................. 7

*Merck & Co. v. Teva Pharms. USA, Inc.*,
   347 F.3d 1367 (Fed. Cir. 2003) ...................................................................... 8

*Modine Mfg. Co. v. United States Int'l Trade Comm'n*,
   75 F.3d 1545, 1550 (Fed. Cir. 1996) ......................................................... 8, 15

*Omega Eng'g, Inc. v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003) ...................................................................... 8

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ............................................. 7, 8, 16

*Storage Tech. Corp. v. Cisco Sys. Inc.*,
   329 F.3d 823 (Fed. Cir. 2003) ............................................................. 8, 13, 14

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) ..................................................................... 7, 8

**Federal Statutes**

37 C.F.R. §§1.71-1.74 ........................................................................................ 8

37 C.F.R. §1.132 ................................................................................................. 3

**Other Authorities**

*http://www.bigbruin.com/reviews/ultraxconnectpsu/index2.php* ......................... 3

*http://www.firingsquad.com/hw/7947/Ultra_X-Connect_V-Series_700W/* ......... 3

*http://www.hardcoreware.net/reviews/review-231-1.htm* ................................... 2

*http://www.overclockersclub.com/reviews/ultra_m998/3.htm* ............................ 3

*Merriam-Webster* Online Dictionary .............................................................. 13

*Webopedia* on-line computer dictionary .......................................................... 10

ii

## I.   INTRODUCTION

Defendants make, use, sell, and/or offer to sell modular power supplies that, when installed in a personal computer case, infringe Claims 1 and/or 4 of U.S. Patent No. 7,133,293, owned by Ultra Products, Inc. ("Ultra"), and entitled "Personal Computer Power Supply Installed Within A Case Of A Personal Computer" (the "'293 Patent").  One of Defendants' counterclaims alleges that Ultra "falsely marks" its m998 mid-tower ATX computer case (which utilizes Ultra's PowerBar technology) by marking the Power Bar contained in the computer case with the '293 Patent number.  Ultra contends that there has been no false marking, because Claim 7 of the '293 Patent covers Power Bar.

Claim construction — a matter of law exclusively for the Court — is the first step toward determining infringement.  Ultra submits this brief to assist the Court in construing the disputed claim terms of the '293 Patent by outlining the disputes, applying the relevant legal principles, and setting forth Ultra's proposed constructions.  As we show below, Ultra's constructions are consistent with the plain language of claims 1, 4, and 7, the patent documents, and the law of claim construction.  On the other hand, Defendants ignore several fundamental principles of claim construction and the plain language of the patent claims themselves, and selectively and improperly read limitations out of Claims 1, 4, and/or 7 in order to support their non-infringement and/or invalidity defenses.[1]  For these reasons, and as fully discussed below, we respectfully request that Ultra's constructions be adopted.

## II.   THE INVENTION OF THE '293 PATENT

Ultra's '293 Patent issued on November 7, 2006 (Exh. 1)[2] and protects Ultra's highly successful "X-Connect" modular power supplies, "XVS" semi-modular power supplies, and "Power Bar" power outlets.  The claimed invention and these families of Ultra products fulfilled the long-felt, but previously unresolved, need in the personal computer industry for power supplies and related components that promote customizable functionality and highly efficient computer performance.

"Modders" are personal computer ("PC") individual users who hand-build their own personal computers using only the fastest, most efficient components with significant "eye appeal".  The market

---

[1] Defendants are jointly proposing the same constructions of all disputed claim terms.

[2] Copies of exhibits referred to in this memorandum are attached to the Declaration of Jeffrey F. Yee, being filed concurrently herewith.

1

for supplying modders with customizable personal computer components is growing rapidly.   Ultra

Ultra is a pioneer in this market, and many of the Defendants are market participants.

Before the invention of '293 Patent, personal computer power supplies were equipped with an array of hard-wired component cables designed to power the diverse array of components found within a personal computer system.  As personal computer systems became smaller and more compact, and as more peripherals (for example, sound cards, video cards, and gaming cards, in combination, etc.) were included within personal computers,   these hard-wired cable assemblies caused modders to face two interrelated problems:

- First, the "spaghetti tangle" of **cables cluttered up the already cramped confines of the computer case;** and, as modders began utilizing clear-sided computer cases, the clutter became unsightly and frustrating.

- Second, the cable clutter **contributed to poor airflow and excessive heat buildup inside these smaller computer cases**, leading to poor computer performance. Despite the existence of personal computer power supplies since the 1980s, the computer industry had failed to find a solution to these problems.

Claims 1-9 of the '293 patent, discussed below, provide solutions to these clutter and airflow problems through the "absence of unnecessary cabling and/or the use of the shortest possible cabling", thus enabling modders to connect only the specific personal computer components (e.g., motherboards, floppy disc drives, hard disc drives, CD-ROMs, CD-RWs, DVDs, sound cards, video cards, gaming cards, network cards, cooling devices, and/or network hubs)" needed. (Exh. 1 at 1:55-63, 12:1-3).

Ultra's '293 Patent invention arrived on the market in June 2004 in the form of Ultra's "X-Connect" product,  and met with instant acclaim from customers and  competitors alike.  The following review excerpts offer a sense of the modder community's reaction to Ultra's invention:

As you can see from the box, this power supply is unlike any you've seen before. Yes, people have been modding their PSU's to have modular 4 pin lines, and there are even stores out there who sell units modded by themselves. But nobody has a modular power supply that is as clean and well designed as the X-Connect.

(Exh. 2: *http://www.hardcoreware.net/reviews/review-231-1.htm*).

Installation [of X-Connect] could not be easier! Being able to route each wire individually made the job easier and looks much better. You only install the  cables you need, and there are no extra wires left to hide when you are done.

2

(Exh. 3: *http://www.bigbruin.com/reviews/ultraxconnectpsu/index2.php*).  Additional evidence of praise in the industry for Ultra's "X-Connect" product was submitted to the Patent Office Examiner during prosecution of the '293 Patent.  *See* 37 CFR 1.132 Declaration of Jon Gerow (Exh. 4).

Ultra's XVS and PowerBar products have met with similar industry praise:

> *The Ultra company has come up with a great idea that helps with the management of the power wires inside of the case. This idea is called the Ultra Power Bar that is located on the motherboard tray. The Ultra Power bar is a patented idea (Patent Number 7,133,293)* by Ultra that allows the user to plug in two 4-pin power connectors and two 8-pin power connectors from the power supply, and gives you the option to have a total of four 4-pin and two 8-pin power ports at the other end. Ultra has packaged a bunch of power cables that can be plugged into one of the 4-pin or 8-pin power outputs on the Power Bar.

(Exh. 5: *http://www.overclockersclub.com/reviews/ultra_m998/3.htm* (emphasis added)).

> *New Ultra XVS 700-watt ATX power supply combines durability and high-performance with quiet dual 80MM cooling fans. Plus, the XVS's cables feature Ultra's patented modular interface that improves airflow inside the chassis up to 30-percent.* All the cables implement Ultra's exclusive FlexForce design. That means you can only plug in the cables you need Then you can easily route them underneath and behind components. The Ultra X-Connect V-Series XVS -- a perfect match for the Ultra Grid Clear Side ATX case.

(Exh. 6: *http://www.firingsquad.com/hw/7947/Ultra_X-Connect_V-Series_700W/*) (emphasis added).

Defendant Antec's own actions -- including trumpeting the "advantage (of) better cable management for airflow and cooling" achieved by its infringing NeoPower modular power supply, and describing NeoPower as having an "Advanced Hybrid Cable Management" feature -- highlighted the industry's belief that the '293 Patent invention was a breakthrough (Exh. 7).[3]  The point is also made by the following excerpt from a "Silent PC Review" article on the infringing NeoPower product:

> The NeoPower's Advanced Cable Management System, *its unique selling proposition of using only the output cables that are needed, is certainly a welcome feature*. The ease of cable management is wonderfully easy, and whatever added resistance is added to the cable is easily dealt with by the PSU's automatic voltage regulating circuitry. This feature will be considered very user-friendly by less experienced PC builders and those too rushed or impatient for cable-gami.

---

[3] As the Court will recall, Antec is the Defendant that filed the request for *inter partes* reexamination of the '293 Patent.

Exh. 8 (emphasis added).

As further testament to the breakthrough nature of the '293 Patent invention, Antec stole the invention it was disclosed in confidence by Ultra to Antec in 2003, when Antec was a trusted Ultra supplier. Antec secretly filed for patent protection on Ultra's invention in Taiwan and China. Chinese and Taiwanese patents were eventually issued to Antec. Ultra first learned that Antec had stolen the invention in July, 2004, when Antec's infringing "Neo" modular power supply hit the U.S. market. In October 2007, Ultra brought an action against Antec in the Beijing First Intermediate People's Court of the People's Republic of China for trade secret misappropriation in connection with Ultra's invention, and to have the Beijing Court declare that the '293 Patent inventors, Messrs. Fiorentino and Kuo, were the true inventors of Antec's Chinese patent. After a trial in March 2009, the Beijing Court entered a judgment in September 2009 holding that Messrs. Fiorentino and Kuo were in fact the inventors of Antec's Chinese patent; that Antec had no right to apply for a patent claiming the Invention; and that the ownership of Antec's Chinese patent should be transferred to Ultra (Exh. 9). The Beijing's Court's decision was affirmed on appeal by Antec in June 2010 (Exh. 10).

## III.   THE '293 PATENT CLAIMS AND TERMS IN DISPUTE

Claims 1-3 relate to "fully modular" personal computer supplies; that is, power supplies where all power transmission cables are <u>directly connected</u> to the power supply via plugs and sockets. *See* Exhibit 11[4], page 7 for examples of both a prior art "spaghetti tangle" power supply (on the left) and a "fully modular" power supply as  installed (on the right) (Ultra's X-Connect product). Ultra is asserting Claim 1 in this case. Claim 1, with the disputed terms emphasized, is reproduced below:

> 1.    A ***personal computer power supply*** installed within a computer case of a ***personal computer*** for receiving AC current from an AC current source and providing DC current from the power supply to at least three ***components*** wherein each ***component*** disposed within the computer case is selected from the group including: (a) a motherboard; (b) a magnetic disc drive; (c) an optical disc drive; (d) an input/output card; (e) a memory card; (f) a sound card; (g) a gaming card; (h) a video card; (i) a network card; (j) network hub; and (k) a cooling device comprising:
>
> a power supply housing having an interior volume defined by a top panel, a bottom panel and a plurality of side panels;

---

[4] Exhibit 11 is a copy of the Response to May 11, 2010 Office Action filed by Ultra in the '293 Patent *inter partes* reexamination on July 12, 2010.

AC to DC circuitry fixed within the interior volume of the power supply housing; at least three *DC output sockets*, wherein each of the DC output sockets is fixed to one of the top panel, bottom panel and side panels of the power supply housing, and wherein at least two of the DC output sockets have different configurations;

      *a plurality of component cables*, wherein each of the component cables has at least two ends, wherein a first end of each of the component cables has a *plug* that is *directly mated* with a respective DC output socket and a second end of each of the component cables is directly mated with at least one of the components;

      wherein the AC to DC circuitry receives AC current from the AC current source; wherein the AC to DC circuitry converts the received AC current into DC current and supplies the DC current to each DC output socket via a wired connection; and wherein each DC output socket is in a position such that, when the power supply is installed within the computer case, each DC output socket is disposed inside of the computer case.

Claims 4-6 relate to "partially modular" personal computer supplies; that is, power supplies where at least two power transmission cables are directly connected to the power supply via plugs and sockets, and at least one power transmission cable is "hardwired" to the interior of the power supply. *See* Exhibit 11, page 8 for examples of both a "partially modular" power supply (Ultra's XVS product) and a prior-art "spaghetti tangle" nonmodular power supply as installed.).  Ultra is asserting Claim 4 in this case.  Claim 4, with the disputed terms bolded, is reproduced below:

      4.    A *personal computer power supply* installed within a computer case of a *personal computer* for receiving AC current from an AC current source and providing DC current from the power supply to at least three *components* wherein each *component* disposed within the computer case is selected from the group including: (a) a motherboard; (b) a magnetic disc drive; (c) an optical disc drive; (d) an input/output card; (e) a memory card; (f) a sound card; (g) a gaming card; (h) a video card; (i) a network card; (j) network hub; and (k) a cooling device comprising:

      a power supply housing having an interior volume defined by a top panel, a bottom panel and a plurality of side panels;

      AC to DC circuitry fixed within the interior volume of the power supply housing; at least two *DC output sockets*, wherein each of the DC output sockets is fixed to one of the top panel, bottom panel and side panels of the power supply housing; at least one DC output cable, wherein a first end of the DC output cable is fixed to the power supply housing, wherein a second end of the DC output cable terminates with at least one *DC output cable plug or cable socket*;

      *a plurality of component cables*, wherein each of the component cables has at least two ends, wherein a first end of each of the component cables has a *plug* that is

5

directly mated with a one of the at least two DC output socket or the at least one DC output cable plug or cable socket and a second end of each of the component cables is *directly mated* with at least one of the components; wherein the AC to DC circuitry receives AC current from the AC current source;

wherein the AC to DC circuitry converts the received AC current into DC current and supplies the DC current to each DC output socket or DC output cable plug or cable socket; wherein each DC output socket is in a position such that, when the power supply is installed within the computer case, each DC output socket is disposed inside of the computer case; and wherein the *DC output plug* is in a position such that, when the power supply is installed within the computer case, the DC output plug is disposed inside of the computer case.

Claims 7-9 relate to the "Power Bar" invention; that is, a personal computer power supply installed within a computer case having a cable that is secured to the power supply housing, and terminates with at least three DC output cable plugs or sockets. Exhibit 5 is an illustration of Ultra's Power Bar product showing these features. Claim 7 of the '293 Patent defeats the Defendants' false marking counterclaim. Claim 7, with the disputed terms bolded, is reproduced below:

7. A *personal computer power supply* installed within a computer case of a *personal computer* for receiving AC current from an AC current source and providing DC current from the power supply to at least three *components* wherein each *component* disposed within the computer case is selected from the group including: (a) a motherboard; (b) a magnetic disc drive; (c) an optical disc drive; (d) an input/output card; (e) a memory card; (f) a sound card; (g) a gaming card; (h) a video card; (i) a network card; (j) network hub; and (k) a cooling device comprising:

a power supply housing having an interior volume defined by a top panel, a bottom panel and a plurality of side panels;

AC to DC circuitry disposed within the interior volume of the power supply housing;

at least one DC output cable, wherein a first end of the DC output cable is fixed to the power supply housing, wherein a second end of the DC output cable terminates with at least three *DC output cable plugs or sockets*, wherein at least two DC output cable plugs or sockets have different configurations;

*a plurality of component cables*, wherein each of the component cables has at least two ends, wherein a first end of each of the component cables is directly mated with a respective *DC output cable plug* or *DC output cable socket* and a second end of each of the component cables is *directly mated* with at least one of the components; wherein the AC to DC circuitry receives AC current from the AC current source;

wherein the AC to DC circuitry converts the received AC current into DC current and supplies the DC current to each DC output cable plug or DC output cable socket; and wherein each *DC output plug* is in a position such that, when the power supply is

6

1   installed within the computer case, each DC output plug is disposed inside of the computer case.

2   The parties' proposed constructions are set forth in the Second Supplemental Joint Claim

3   Construction Statement (Dkt. 305), attached as Exhibit 12.  For the reasons discussed below, we submit

4   that Ultra's constructions of the disputed terms should be adopted in their entirety.

5   **IV.   ARGUMENT**

6   **A.   The Principles Of Claim Construction**

7   Claim construction is a question of law for the Court.  *Markman v. Westview Instruments, Inc.*,

8   52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, 391 (1996). "It is a 'bedrock principle' of patent

9   law that 'the claims of a patent define the invention to which the patentee is entitled the right to

10  exclude.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*); *see also Vitronics*

11  *Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("we look to the words of the claims

12  themselves ... to define the scope of the patented invention").  Claim terms are generally given their

13  "ordinary and customary meaning." *Vitronics*, 90 F.3d at 1582.  "The ordinary and customary meaning

14  of a claim term is the meaning that the term would have to a person of ordinary skill in the art in

15  question at the time of the invention, i.e., **as of the effective filing date of the patent application**."

16  *Phillips*, 415 F.3d at 1313 (emphasis added).  The person of ordinary skill in the art is deemed to read

17  the claim term not in a vacuum, but "in the context of the entire patent, including the specification." *Id.*

18  The "preamble" of a patent claim consists of the words appearing before the recitation of

19  elements in the body of the claim; and typically ends with a transitional term such as "comprising".  In

20  general, a preamble does not limit the scope of a patent claim.  *Catalina Mktg. Int'l, Inc. v.*

21  *Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002).  However, there are three situations in which

22  preamble language will have a limiting effect on claim scope: (1) when the limitations in the body of the

23  claim rely upon and derive antecedent basis from the preamble; (2) when the preamble recites essential

24  structure or steps or is necessary to give life, meaning and vitality to the claim; and (3) if there was clear

25  reliance on the preamble during prosecution to distinguish the prior art. *Id.*

26  "The claims must be construed so as to be consistent with the specification, of which they are a

27  part."  *Merck & Co. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003).  The

28  specification is "the primary basis for construing the claims." *Phillips*, 415 F.3d at 1315.  The patent

7

specification includes the: (1) "Abstract" of the invention; (2) "Background of the Invention";   (3) "Summary of the Invention"; (4) patent drawings, if any; and (5) "Detailed Description of the Preferred Embodiments".   37 C.F.R. §§1.71-1.74.   However, it is well-settled that "particular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments." *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).   Conversely, a claim construction which excludes a preferred embodiment of the invention disclosed in the patent should not be adopted, since such a construction is rarely, if ever, the correct one. *Modine Mfg. Co. v. United States Int'l Trade Comm'n*, 75 F.3d 1545, 1550 (Fed. Cir. 1996).

The prosecution history of a patent should also be considered in construing disputed claim terms. *Markman*, 52 F.3d at 980.   The prosecution history "consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent". *Phillips*, 415 F.3d at 1317.   Thus, a claim term carries the "full range" of its art-recognized meaning unless the specification and prosecution history "compel" an "manifest exclusion or restriction" limiting the claim term. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003).   Alleged disavowing statements must be both so clear as to show reasonable clarity and deliberateness, and so unmistakable as to be unambiguous evidence of disclaimer. *Storage Tech. Corp. v. Cisco Sys. Inc.*, 329 F.3d 823, 833 (Fed. Cir. 2003); *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364 (Fed. Cir. 2003).

Finally, dictionaries and treatises "are often useful to assist in understanding the commonly understood meaning of words and have been used both by [the Federal Circuit] and the Supreme Court in claim interpretation." *Phillips*, 415 F.3d at 1323.   Courts may "rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict  any definition found in or ascertained by a reading of the patent documents." *Vitronics*, 90 F.3d at 1584, n. 6, 1585.

### B.   The Proper Construction Of The Disputed Claim Elements

#### 1.   The Preamble Of Claims 1, 4 And 7 Is A Claim limitation

The preamble of Claims 1, 4 and 7 reads: "*A personal computer power supply installed within a computer case of a personal computer for receiving AC current from an AC current source and providing DC current from the power supply to at least three components wherein each component*

*disposed within the computer case is selected from the group including: (a) a motherboard; (b) a magnetic disc drive; (c) an optical disc drive; (d) an input/output card; (e) a memory card; (f) a sound card; (g) a gaming card; (h) a video card; (i) a network card; (j) network hub; and (k) a cooling device.*" Here, the preamble is a limitation of Claims 1, 4 and 7 for three reasons. First, the Examiner required the patentee to add the preamble to each claim of the '293 Patent to distinguish over the prior art (Exh. 13: 6/6/06 Notice of allowability at 2-3). *Catalina*, 289 F.3d at 808. Second, the preamble provides antecedent basis for the terms "power supply", "personal computer", and "component[s]" used in the body of these claims. *Id.* Third, the preamble recites essential structure necessary to give life, meaning and vitality to the claim; specifically: (1) a particular type of computing device designed for individual use (*i.e.*, a "personal computer"); and (2) components such as sound cards, video cards, gaming cards, which are commonly found only in combination in personal computers because they are necessary for enhancing the interactive experience between the computer and its user:

> 5.    I understand the improvements of the modular power supply invention, as described in U.S. Patent Application Publication No. US 2005/0207129 A1, over the prior art *in the field of personal computer* power supplies. Additionally. I know that there is an active market of computer *users who purchase personal computer hardware components* (including power supplies) in order to construct 'custom' *personal* computers. As discussed above, a number of industry websites exist that are targeted to this set of computer users, which offer reviews of computer *hardware products* and other information useful to those interested in *"custom" personal computers*.

(Exh. 4: Gerow Decl., May 15, 2006 (emphasis added).

Accordingly, the preamble should be deemed a limitation of Claims 1, 4, and 7.

2.    *"personal computer"* (Claims 1, 4, And 7)

| Claim Term | Ultra's Proposed Construction |
|---|---|
| "personal computer" | a computer designed for an individual user, and expressly excludes servers |

Both Ultra and the Defendants construe the term "personal computer" to mean "a computer designed for an individual user", and the dispute centers on whether the term should also include "servers." At bottom, the problem with the Defendants' construction is that it is internally inconsistent.

9

Specifically, the second part of the Defendants' construction stating "***but usable*** in any application including personal computer servers" presupposes that such other applications are not "designed for an individual user" as required by the first part of their construction. As a result, if "personal computer servers" are not designed for an individual user, as the Defendants' construction concedes, they cannot possibly meet the first part of the Defendants' construction. Ultra's construction, however, which excludes servers, is much more logical, and is consistent with the proposition with which both parties agree—*i.e.*, that a personal computer is "designed for an individual user".

The only type of computing device the '293 Patent specification and claims reference in connection with the invention is a "personal computer" designed for individual use, and including the type of components uniquely found in combination in these computing devices—*i.e.*, "sound cards, video cards, gaming cards" (Exh. 1 at 1:55-63; Claims 1-9). Such components have no use in other computing devices such as servers, because servers are designed for an entirely different function than a personal computer designed for individual use. *See, e.g., Webopedia* on-line computer dictionary, defining "personal computer" as "[a] small, relatively inexpensive computer designed for an individual user"; and defining "server" as "[a] computer or device on a network that manages network resources" (Exhs. 14 - 15). Indeed, the '293 Patent contains no statement or suggestion that computing devices such as servers, or other devices not designed for individual use, can be used in the practice of the claimed invention.

The prosecution history of the '293 Patent also leads to the conclusion that the term "personal computers" should exclude servers, and other computing devices not designed for individual use. For example, in a May 2006 declaration filed by Jon Gerow in the PTO to support patentability of the then-pending claims, Mr. Gerow emphasizes his understanding as one skilled in the art that the claimed invention is directed to individuals who purchase computer hardware to "construct 'custom' personal computers" for their own individual use (an activity antithetical to servers and the like). (Exh. 4: Gerow Decl., May 15, 2006, reprinted *supra* (emphasis added).

The PTO left no doubt that Ultra's construction of "personal computer" is the correct one, when it issued a Notice of Allowance on June 6, 2006 in which the Examiner amended the title of the '293

PLAINTIFF ULTRA PRODUCTS, INC.'S OPENING CLAIM CONSTRUCTION BRIEF

Patent to include the words "personal computer", and each of the allowed claims to *require* that the "personal computer case" include a "sound card", a "video card", and a "gaming card":

> "For the title, the change amend as follow:
> **[I]** Change 'POWER SUPPLIES AND METHODS OF INSTALLING POWER SUPPLIES' TO -- **A PERSONAL COMPUTER POWER SUPPLY INSTALLED WITHIN A CASE OF A PERSONAL COMPUTER - -**.
> \*\*\*\*
> **[III]** Claims 63-65, line 3, after "***three components***" please, delete -- *disposed inside of the computer case*, and insert -- *wherein each component disposed within the computer case is selected from the group including: (a) a motherboard; ; (b) a magnetic disc drive; (c) an optical disc drive; (d) an input/output card; (e) a memory card; (f) a sound card; (g) a gaming card; (h) a video card; (i) a network card; (j) network hub; and (k) a cooling device* --."

(Exh. 13: Notice Of Allowability, June 6, 2006, at 2-3 (emphasis in original)).

Significantly, in documents filed by Defendant Antec in its pending *inter partes* reexamination of the '293 patent, Antec admits that a server is simply a different animal than a personal computer:

> At the 1999 Intel technology Symposium it positioned the IA based Workstation as a "Desk-top on Steroids." (191DOC000071). **It specifically distinguished this technology from servers, positioning servers as "too big, too costly."** (191DOC000072). The 1999 Technology Symposium presentations positions IA32 bit technology as an entry level workstation, that can even operate with the PS-2 operating system and the IA 64 occupying the mid range and high end workstations. **All product offerings were for personal use, not for shared use like a server.**

Exh. 16: Response to June 11, 2010 Owner's Response filed by Third Party Requester Antec in *Inter Partes* Reexamination Serial No. 95/001,319 on July 12, 2010, at page 18 (emphasis added).

There is simply no evidence in the intrinsic record of the '293 Patent that would have caused a skilled artisan at the time of the invention to conclude that a server is a computing system designed for individual use; or would include devices in combination  unique to personal computers such as sound cards, video cards, and gaming cards.   Ultra's construction of the term "personal computer" is consistent with the plain language of Claims 1, 4, and 7, the intrinsic record of the '293 Patent, and the common and ordinary distinction between a personal computers and "servers."  On the other hand, the

11

1  Defendants' construction is internally inconsistent, and finds no support in either the claim language or

2  the intrinsic record.

3  Accordingly, Ultra's proposed construction of "personal computer" should be adopted.

4       3.      *"personal computer power supply"* (Claims 1, 4, And 7)

| Claim Term | Ultra's Proposed Construction |
| --- | --- |
| "personal computer power supply" | a component adapted to receive AC current and provide DC current to a personal computer, and expressly excludes redundant power supplies |

9     The parties' constructions of "personal computer power supply" differ in that Ultra's

10 construction expressly excludes "redundant power supplies".  Ultra's construction should be adopted

11 because it is fully consistent with the intrinsic record of the '293 Patent.

12     First, the patent specification discloses single, customizable modular and semi-modular power

13 supplies for individual user personal computers; not multiple, redundant power supplies used as back-up

14 sources of power in the event the main power supply in, for example, a server, becomes disabled.

15 Indeed, the prosecution history makes clear that the claimed invention sets forth "configurations that

16 allow formation of cable assemblies in a way to allow selection and customization by the buyer of a

17 *single power supply unit*."  (Exh.17: March 15, 2006 Interview Summary of  2/1/06 Interview, at 2

18 (emphasis added)).

19     Finally, the inventors distinguished the claimed invention over "prior art" redundant power

20 supplies in their Request for Continued Examination filed with the PTO on May 16, 2006 (Exh. 18:

21 5/15/06 Request for Continued Examination at 10 ("In contrast, the Wiscombe patent expressly

22 discloses and teaches that its power supply is for "rack mounted" systems using "redundant power

23 supplies" - the present claims were amended to limit to personal computers." (emphasis in original));

24 and 14 ("Moreover, to assist the Examiner in understanding of the Wiscombe patent, Applicants have

25 attached a pictorial (8 pages) that illustrates a larger capacity computer with a conventional rack-

26 mounted computer systems having a standard redundant power supply system. Although this pictorial is

27 not meant to show the exact wording or the exact embodiment of the Wiscombe patent, the pictorial

28 illustrates that individual power supplies conventionally directly mate with a paralleling type circuit

board in a larger capacity computer with a conventional rack-mounted computer systems having a standard redundant power supply system." (emphasis in original)).   Under the rules of claim construction, these statements by the inventors are disclaimers that limit the scope of the Claims 1, 4 and 7 so as to exclude redundant power supplies. *Storage Tech. Corp.*, 329 F.3d at 833.

### 4.    *"directly mated"* (Claims 1, 4, And 7)

| Claim Term | Ultra's Proposed Construction |
| --- | --- |
| "directly mated" | to join or fit together without any intervening structure |

The parties' constructions differ in that Ultra's construction requires the absence of any intervening "structure", and the Defendants' construction only requires the absence of any intervening "cable".  Ultra's proposed construction should be adopted, because it most consistent with the intrinsic record of the '293 Patent and the ordinary meaning of the word "mate".

The dictionary defines the verb "mate" to mean "to join or fit together" (Exh. 19: *Merriam-Webster* Online Dictionary).  Joining or fitting two parts together clearly suggests the absence of any intervening structure.  The disclosure of the '293 patent specification is consistent with this definition.  Indeed, Figure 7 and the accompanying specification text at col. 9, lines 22-33 disclose component cables "which can be individually plugged at one end into their respective sockets of the power supply 110 and at their other ends to the respective components inside the device receiving the power, such as a personal computer" without any intervening structure whatsoever (Exh. 1).

The prosecution history of the '293 patent further supports Ultra's construction.  In the May 15, 2006 Request for Continued Examination and accompanying remarks, the inventors expressly amended the pending claims to recite personal computer power supplies "directly mated" to components via component cables, and clearly delineated the difference between "directly mated" component cables and cables used with redundant power supplies such as those disclosed in the Wiscombe patent (which are *indirectly* mated to computer components via an intermediate power distribution/bus apparatus) (Exh. 18 at pp. 13-14: "As such, the Wiscombe patent teaches away from the claimed element that the SAME CABLE that has a first end that has a plug that is directly mated with a respective DC output socket also has a second end of each of the component cables that is directly mated with at least one of the

PLAINTIFF ULTRA PRODUCTS, INC.'S OPENING CLAIM CONSTRUCTION BRIEF

components."). These statements are disclaimers that limit the scope of the term "directly mated" so as to exclude the presence of any intervening structures. *Storage Tech. Corp.*, 329 F.3d at 833.

### 5. *"a plurality of component cables"* (Claims 1, 4 And 7)

| Claim Term | Ultra's Proposed Construction |
|---|---|
| "a plurality of component cables" | two or more cables, each of which is attachable to a different component selected from the group including: (a) a motherboard; (b) a magnetic disc drive; (c) an optical disc drive; (d) an input/output card; (e) a memory card; (f) a sound card; (g) a gaming card; (h) a video card; (i) a network card; (j) network hub; and (k) a cooling device |

The dispute centers on whether a plurality of "component cables" must be bound to different components. Ultra's construction, which contains this requirement, should be adopted because it is most consistent with the claim language and the intrinsic record of the '293 Patent.

The preamble of Claims 1, 4 and 7 states in part : "*providing DC current from the power supply to **at least three components wherein each component disposed within the computer case is selected from the group including**: (a) a motherboard; (b) a magnetic disc drive; (c) an optical disc drive; (d) an input/output card; (e) a memory card; (f) a sound card; (g) a gaming card; (h) a video card; (i) a network card; (j) network hub; and (k) a cooling device.*" By its terms, the phrase "*at least three components wherein each component disposed within the computer case is selected from the group including*" means that three different components are selected from the recited group. The term "component" in the preamble provides antecedent basis for the term "component" in the subject claim term. Thus, consistent with Ultra's construction, the "claimed "plurality of component cables" must mean two or more cables selected from the group of components recited in the preamble.

Ultra's construction is also consistent with the disclosure of the patent specification. The specification then makes clear that the components that must be powered by the component cables necessarily include a plurality of *different* components. For example, col. 9, lines 22-30 disclose:

Referring now to FIG. 7, ...a *separate modular motherboard cable* 116 (connected to power supply 110 via plug 118 and socket 140) as well *as separate modular 12 volt power, auxiliary power and peripheral cables*, which can be *individually* plugged at one

14

*end into their <u>respective</u> sockets* of the power supply 110 and at their ***other ends to the respective** components* inside the device receiving the power." (emphasis added.)

The different components to be powered by the "plurality of component cables" are described, for example, at col. 1, lines 55-63 of the '293 Patent specification:

> *[T]he term 'component' is intended to refer to any interior element or part of a computer* (e.g., *personal computer*) requiring a supply of power. Thus, as used herein, the term "component" is intended to include, but not be limited to: one or more motherboards, floppy disc drives, hard disc drives, CD-ROMs, CD-RWs, DVDs, *sound cards, video cards, gaming cards, network cards, cooling devices, and/or network hubs.* (emphasis added.)

At col. 9, lines 34-45, the '293 Patent specification further describes the customization facilitated by having the "plurality of component cables" power different components within the preamble list:

> Accordingly, *only those cables* that are *needed for a particular configuration* need be utilized (in one example (which example is intended to be illustrative and not restrictive), only those cables that are needed for a particular configuration of a personal computer *with certain installed components* need be utilized). Of course, as *additional components are added, additional <u>cables</u> may simply be plugged into the power supply 110 and into the component for use. Likewise, as any <u>components</u> are removed, the <u>respective cables</u> may simply be unplugged from the power supply 110.*" (emphasis added).

The above modularity and customization features of the invention disclosed in the patent specification and resulting from practice of Claims 1, 4 and 7 are the preferred embodiments of the claimed invention. These preferred embodiments would be excluded from Claims 1, 4, and 7 if the term "plurality of component cables" were construed to mean that the cables could provide power to the *same* components. A claim construction which excludes preferred embodiments of the invention disclosed in the patent specification is rarely, if ever, the correct construction. *Modine*, 75 F.3d at 1550. *See also* the March 15, 2006 Interview Summary at 2 (Exh. 17), stating that the claimed invention sets forth "configurations that allow formation of cable assemblies in a way to allow *selection and customization by the* buyer". Such "selection and customization" features of the invention can only be achieved by construing "plurality of component cables" as proposed by Ultra—*i.e.*, "two or more cables, each of which is attachable to a different component selected from the group including: (a) a motherboard; (b) a

15

magnetic disc drive; (c) an optical disc drive; (d) an input/output card; (e) a memory card; (f) a sound card; (g) a gaming card; (h) a video card; (i) a network card; (j) network hub; and (k) a cooling device."

### 6.   *"socket"* (Claims 1, 4, And 7)

| Claim Term | Ultra's Proposed Construction |
|---|---|
| "socket" | a DC output device that cooperates with a plug to provide a connectable/breakable electrical connection, and which is attached to a relatively fixed structure, such as a housing (not necessarily the power supply housing) |

Ultra's construction is consistent with the express definition of the term "socket" set out by the inventors in the '293 Patent specification.  At column 1, lines 38-45, the specification states:

> For the purposes of describing and claiming the present invention, the term "socket" is intended to refer to a device which cooperates with a "plug" (defined below) to provide a connectable/breakable electrical connection.  Such a socket may have, for example, a male or female electrical terminal configuration and a male or female physical body configuration.  Further, such a socket is intended to refer to a device attached to a relatively fixed structure, such as a housing.

By its terms, the inventors' definition of "socket" is not limited to devices attached or fixed to the power supply housing.  Indeed, the inventors' definition merely says "*a* housing".  As shown by the patent's discussion of the prior art, the '293 Patent's use of the term "housing" is not limited to the power supply housing.  *See* col. 2, lines 47-63 discussing prior art U.S. Patent No. 5,822,181 ("U.S. Pat. No. 5,822,181 relates to a computer system having a unitary housing structure for containing a display unit, a power supply, and a docking bay receptacle to accommodate an insertion of a main computer body; and an electrical power/signal connection assembly installed to provide electrical power/signal connections between the power supply, the display unit and the main computer body.").

Because Ultra's construction of the term "socket" most closely aligns with the claim language and the disclosure of the '293 Patent specification, Ultra's construction should be adopted.  *Phillips*, 415 F.3d at 1316 ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.").

16

7.   **_"DC output sockets"_ (Claims 1 And 4)**

| Claim Term | Ultra's Proposed Construction |
|---|---|
| "DC output sockets" | a DC output device that cooperates with a plug to provide a connectable/breakable electrical connection, and which is attached to a relatively fixed structure, such as a housing (not necessarily the power supply housing) |

Ultra's construction of the term "DC output sockets" should be adopted, because it is consistent with the inventors' definition of the term "socket" in the '293 patent specification.

8.   **_"plug"_ (Claims 1, 4, And 7)**

| Claim Term | Ultra's Proposed Construction |
|---|---|
| "plug" | a device which cooperates with a socket to provide a connectable, breakable electrical connection, and which is attached to a relatively movable structure, such as a cable (but not necessarily a cable) |

At col. 1, lines 46-54, the '293 Patent specification defines the term "plug" as follows:

> For the purposes of describing and claiming the present invention, the term "plug" is intended to refer to a device which cooperates with a "socket" (defined above) to provide a connectable/breakable electrical connection.  Such a plug may have, for example, a male or female electrical terminal configuration and a male or female physical body configuration. Further, such  a plug is intended to refer to a device attached to a relatively movable structure, such as a cable.

Thus, the above definition of "plug" does not limit the type of "relatively movable structure" to which the plug is attached; but merely cites a "cable" as one example of such a structure.  Accordingly, Ultra's construction of the term "plug" should be adopted, because it is consistent with the inventors' express definition of the term "plug" disclosed in the '293 Patent specification.

9.   **_"DC output cable plug"_ (Claim 7)**

| Claim Term | Ultra's Proposed Construction |
|---|---|
| "DC output cable plug" | a DC output device, that cooperates with a socket to provide a connectable, breakable electrical connection, and which is attached to a relatively movable structure, such as a cable (but not necessarily a cable) |

17

Ultra's construction of the term "DC output cable plug" should be adopted, because it is consistent with the inventors' definition of the term "plug" disclosed in the '293 patent specification.

### 10.     *"DC output plug"* (Claims 4 And 7)

| Claim Term | Ultra's Proposed Construction |
| --- | --- |
| "DC output plug" | a DC output device, that cooperates with a socket to provide a connectable, breakable electrical connection, and which is attached to a relatively movable structure, such as a cable (but not necessarily a cable) |

Ultra's construction of the term "DC output plug" should be adopted, because it is consistent with the inventors' definition of the term "plug" disclosed in the '293 patent specification.

### 11.     *"DC output cable socket"* (Claim 7)

| Claim Term | Ultra's Proposed Construction |
| --- | --- |
| "DC output cable socket" | a DC output device that cooperates with a plug to provide a connectable/breakable electrical connection, and which is attached to a relatively fixed structure, such as a housing (not necessarily the power supply housing) |

Ultra's construction of the term "DC output cable socket" should be adopted, because it is consistent with the inventors' definition of the term "socket" disclosed in the '293 patent specification.

### 12.     *"DC output cable plug or cable socket"* (Claims 4 And 7)

| Claim Term | Ultra's Proposed Construction |
| --- | --- |
| "DC output cable plug or cable socket" | "DC output cable plug" means: a DC output device, that cooperates with a socket to provide a connectable, breakable electrical connection, and which is attached to a relatively movable structure, such as a cable (but not necessarily a cable). |
| | "DC output cable socket" means: a DC output device that cooperates with a plug to provide a connectable/breakable electrical connection, and which is attached to a relatively fixed structure, such as a housing (not necessarily the power supply housing) |

18

As discussed above in connection with the terms "DC output cable plug" and "DC output cable socket", Ultra's construction of "DC output cable plug or cable socket" should be adopted, because it is consistent with the inventors' definition of the terms "socket" and "plug" in the '293 Patent.

## IV.   CONCLUSION

For the reasons set forth above, Ultra respectfully requests that its proposed constructions of the disputed terms of Claims 1, 4, and 7 of the '293 Patent be adopted in their entirety.

Dated: July 14, 2010

GREENBERG TRAURIG LLP

By:   /s/ Jeffrey F. Yee
Michael A. Nicodema, (*Pro Hac Vice*)
David M. Joyal (*Pro Hac Vice*)
200 Park Avenue
Florham Park, New Jersey 07932
Telephone:  (973) 360-7900
Facsimile:  (973) 301-8410

and

Jeffrey K. Joyner (SBN 180485)
Jeffrey F. Yee (SBN 193123)
2450 Colorado Avenue Suite 400E
Santa Monica, California 90404
Telephone:  (310) 586-7700
Facsimile:  (310) 586-7800
   Attorneys for Plaintiffs Ultra Products, Inc

19

**CERTIFICATE OF SERVICE**

I hereby certify that on July 14, 2010, I electronically filed the following documents:

**PLAINTIFF ULTRA PRODUCTS, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

with the Clerk of the Court using CM/ECF system which will send notification of such filing to the e-mail addresses denoted below:

Daniel S. Mount, Esq.
Kathryn G. Spelman, Esq.
Kevin M. Pasquinelli, Esq.
Daniel H. Fingerman, Esq.
On Lu, Esq.
Ruby I. Ho, Esq.
Mount & Stoelker, P.C.
Riverpark Tower, Suite 1650
333 West San Carlos Street
San Jose, CA  95110
Tel: 408-279-7000; Fax: 408-998-1473
Emails: dmount@mount.com; kspelman@mount.com; dfingerman@mount.com;
kpasquinelli@mount.com; olu@mount.com; rho@mount.com; mbikul@mount.com

☒   **(BY CM/ECF)**
Pursuant to CM/ECF System, registration as a CM/ECF user constitutes service through the Court's transmission facilities.  The Court's CM/ECF system sends an e-mail notification of the filing to the parties and counsel of record listed above who are registered with the Court's EC/ECF system.

☒   (FEDERAL)        I declare under penalty of perjury that the foregoing is true and correct, and that I am employed at the office of a member of the bar of this Court at whose direction the service was made.

Executed on July 14, 2010, at Santa Monica, California.

_____
Alexia Heatherly

MOUNT & STOELKER
RIVERPARK TOWER, SUITE 1650
333 WEST SAN CARLOS
SAN JOSE, CALIFORNIA 95110-2711
TELEPHONE (408) 279-7000