*E-Filed 10/19/10*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

STREAK PRODUCTS, INC.,

        Plaintiff,

  v.

ANTEC, INC., et al.,

        Defendants.

No. C 09-4255 RS

**CLAIM CONSTRUCTION ORDER**

## I. INTRODUCTION

Plaintiff Streak Products, Inc. ("Streak")[1] is the owner of United States Patent No. 7,133,293 ("'293 Patent"), which relates to modular and partially modular power supplies installed in personal computers. Streak sued a number of defendants (collectively, "Alliance") for allegedly infringing the '293 Patent. On August 11, 2010, this Court held a claim construction hearing. The parties requested the opportunity to submit further briefing on the question of indefiniteness and did so on August 31, 2010.

The '293 patent issued on November 7, 2006. Streak explains that it encompasses Streak's "X-Connect" fully modular power supplies, "XVS" semi-modular power supplies, and "Power Bar"

---

[1] Streak Products was formerly known as Ultra Products.

outlets. This family of power supply products is directed toward "modders," or "overclockers;" in other words, individual users who build personal computers by hand. Streak contends its modular and semi-modular power supplies power the components of a personal computer with as many or as few connecting cables as are necessary. It explains that the modular concept eliminates unnecessary cabling and, as a consequence, minimizes both clutter and equipment overheating.

## II. LEGAL STANDARD

### A. Claim Construction

Claim construction is an issue of law, and begins "with the words of the claim." *Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1142 (Fed. Cir. 2005) (*citing Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). Terms contained in claims are "generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks omitted). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention[.]" *Id.* at 1313. When determining the proper construction of a claim, a court begins with the intrinsic evidence of record, consisting of the claim language, the patent specification, and, if in evidence, the prosecution history. *Id.* at 1313. *See also Vitronics*, 90 F.3d at 1582.

Although claims are interpreted in light of the attendant specification, this "does not mean that everything expressed in the specification must be read into all the claims." *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 957 (Fed. Cir. 1983). For instance, limitations from a preferred embodiment described in the specification generally should not be read into the claim language. *See Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998). It is a fundamental rule, however, that "claims must be construed so as to be consistent with the specification." *Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003). Therefore, if the specification reveals an intentional disclaimer or disavowal of claim scope, the claims must be read consistent with that limitation. *Phillips*, 415 F.3d at 1316. Finally, the Court may consider the prosecution history of the patent, if in evidence. The prosecution history limits the interpretation of

claim terms so as to exclude any interpretation that was disclaimed during prosecution. *See Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995).

In most situations, analysis of this intrinsic evidence alone will resolve claim construction disputes. *See Vitronics*, 90 F.3d at 1583. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317. Courts should not rely on extrinsic evidence in claim construction to contradict the meaning of claims discernable from examination of the claims, the written description, and the prosecution history. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (*citing Vitronics*, 90 F.3d at 1583). It is entirely appropriate, however, "for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field." *Id.*

B.  The Law of Indefiniteness

35 U.S.C. § 112, ¶ 2 requires that a patent specification "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." Because claims delineate the patentee's right to exclude, the patent statute requires that the scope of the claims be sufficiently definite to inform the public of the bounds of the protected invention. *Halliburton v. Energy Servs., Inc. v. M-I, LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008). "Otherwise, competitors cannot avoid infringement, defeating the public notice function of patent claims." *Id.* (*citing Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1581 (Fed. Cir. 1996) ("[T]he primary purpose of the requirement is 'to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their [respective] rights.'")). The Supreme Court long ago explained that "[t]he statutory requirement of particularity and distinctness in claims is met only when [the claims] clearly distinguish what is claimed from what went before in the art and clearly circumscribe what is foreclosed from future enterprise." *United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 236 (1942).

"The definiteness requirement, however, does not compel absolute clarity," and "[o]nly claims not amenable to construction or insolubly ambiguous are indefinite." *Datamize v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (*quoting Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1353 (Fed. Cir. 2003); *Exxon Research & Eng'g*, 265 F.3d 1371, 1375 (Fed. Cir. 2001)). Definiteness of claim terms "depends on whether those terms can be given any reasonable meaning." *Id.* "[C]laims are not indefinite merely because they present a difficult task of claim construction." *Halliburton*, 514 F.3d at 1249. As the Federal Circuit has instructed, "[i]f the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree," then the claim is "sufficiently clear to avoid invalidity on definiteness grounds." *Exxon Research*, 265 F.3d at 1375. "Proof of indefiniteness requires such an exacting standard because claim construction often poses a difficult task over which expert witnesses, trial courts, and even the judges of [the Federal Circuit] may disagree." *Halliburton*, 514 F.3d at 1249-50 (internal quotation marks and citations omitted). Nevertheless, this standard is met where an accused infringer shows by clear and convincing evidence that a person skilled in the art could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as his or her knowledge of the relevant art area. *Halliburton*, 514 F.3d at 1249-50. The stringent standard comports, of course, with the statutory presumption that issued patents are valid. *Datamax*, 417 F.3d at 1347.

## III. DISCUSSION

### A. Claim Construction

In the claim construction briefing, the parties asked the Court to construe six terms. At the claim construction hearing, the parties narrowed their disputed terms to just two, having reached an agreement on the proper construction for the remaining four. Prior to the hearing, the disputed terms were "personal computer," "personal computer power supply," "directly mated," "a plurality of component cables," "socket," and "plug." Both "socket" and "plug" have related terms: "DC output cable plug" and "DC output cable socket," but the parties suggest these share the same definitions as "socket" and "plug." The parties currently disagree only as to the proper construction

of "personal computer power supply" and "a plurality of component cables." Finally, Alliance argues Claims Four and Seven are invalid as construed for indefiniteness.

    a.  Personal computer (Claims One, Four, Seven)

At the motion hearing, the parties agreed to construe "personal computer" as "a computer designed for an individual user."

    b.  Personal computer power supply (Claims One, Four, Seven)

Streak proposes the following construction of personal computer power supply: "a component adapted to receive AC current and provide DC current to a personal computer, and expressly excludes redundant power supplies." Defendant argues the construction should instead read, "a device that receives AC current and provides DC current to the components of a personal computer." In its reply brief, Streak acceded to Alliance's preference for the word "device," as opposed to "component," at the beginning of the sentence. The parties also agree that "current to the components of a personal computer" means functionally the same thing as "current to a personal computer." The dispute here relates to whether Streak's suggested negative inference excluding redundant power supplies is supportable. A "redundant" power supply is essentially a "back up" source of power used in the event that the main power supply becomes disabled. While the parties appear to agree that redundant power supplies are commonly associated with servers connected to multiple machines, and further agree that the '293 patent is directed toward personal computers, Alliance suggests it does not necessarily follow that a personal computer would never have or need a backup power supply.

Streak argues, first, that all patent documents refer to a main power supply and do not anywhere suggest a redundant, or "back up," embodiment. Moreover, Streak insists the inventors expressly disclaimed during prosecution any embodiments involving "redundant power supplies" in order to distinguish prior art. A prosecution disclaimer arises where the inventor "expressly relinquishes" an embodiment otherwise within the scope of a claim. *See Omega Eng'g v. Raytek Corp.*, 334, F.3d 1314, 1323 (Fed. Cir. 2003) ("We indulge a heavy presumption that claim terms carry their full ordinary and customary meaning, unless the patentee . . . expressly relinquished

claim scope during prosecution.") (internal quotation marks and citation omitted). As the Federal Circuit has emphasized, the doctrine of prosecution disclaimer is unavailable where the alleged disavowal of claim scope is ambiguous. *Id.* Rather, the Federal Circuit has "required the alleged disavowing statements to be both so clear as to show reasonable clarity and deliberateness, and so unmistakable as to be unambiguous evidence of disclaimer." *Id.* at 1324 (citation omitted).

Streak points to several statements from the prosecution history that it argues demonstrate the inventors' "clear and unambiguous" disavowal of redundant power supplies. First, Streak highlights a statement made in an Interview Summary on March 16, 2006, highlighting how the claimed invention sets forth "configurations that allow formation of cable assemblies in a way to allow selection and customization by the buyer of a single power supply unit." (Ex. 17: March 15, 2006 Interview Summary of 2/1/06 Interview, at 2.) Streak suggests the phrase "single power supply unit" is utterly inconsistent with the idea of a backup power supply. Alliance argues the sentence quoted is taken out of context. The complete paragraph, it points out, notes how the product is designed for individual users, rather than for large corporations that might need to purchase many units. Both explanations read comfortably from the paragraph. Accordingly, Alliance's suggestion that that the statement's meaning is ambiguous is well-taken.

Streak turns next to statements it made to the PTO to distinguish the '293 patent from prior art. In a May 15, 2006 Request for Continued Examination ("RCE"), Streak argues the inventors "repeatedly distinguished" the claimed invention from the "entire category" of redundant power supplies. Alliance counters that Streak's inventors only disclaimed a particular *type* of redundant power supply: the rack mounted, external, backup power supply that was the subject of a Wiscombe patent. Streak emphasized how "the Wiscombe patent expressly discloses and teaches that its power supply is for 'racked mounted' systems using 'redundant power supplies'—the present ['293] claims were amended to limit to personal computers." At another point, it reiterated that "[t]he Wiscombe patent . . . addresses the problem with 'redundant power supplies' (not personal computer power supplies)." Streak reads these statements as a categorical disclaimer of all redundant power supplies from the claimed "personal computer power supply." This time, Streak's

No. C 09-4255 RS
CLAIM CONSTRUCTION ORDER

6

disclaimer does not suffer from the type of ambiguity discussed above. While Wiscombe's redundant power supply may have been of the rack mounted variety, it is apparent that the '293 inventors sought to disclaim more than this when they contrasted Streak's personal computer power supply from redundant power *supplies*. Moreover, every item of intrinsic evidence details the workings of a *main* power supply, whose function is essentially to supply DC current to a personal computer and its components. Accordingly, "personal computer power supply" shall be construed to include Streak's proposed limitation: "a device that receives AC current and provides DC current to the components of a personal computer, and expressly excludes redundant power supplies."

      c. A plurality of component cables (Claims One, Four, Seven)

Streak would construe "a plurality of component cables" as "two or more cables, each of which is attachable to a different component selected from the group including: (a) motherboard; (b) a magnetic disc drive; (c) an optical disc drive; (d) an input/output card; (e) a memory card; (f) a sound card; (g) a gaming card; (h) a video card; (i) a network card; (j) network hub; (k) a cooling device." Alliance disagrees only with inclusion of the word "different." Streak explains that Claim One contemplates a power source that supplies DC current to "at least three" components. It reasons that if "different" modifies "component," it will help to ensure that this requirement is met. Alliance counters that "different" is not limited to this reading and would actually import meaning inconsistent with the patent history. It suggests Streak's construction would mean that, even assuming three components were in play, it would not be permissible to connect more than one cable to the same component. To demonstrate why this is a problem, Alliance focuses on the motherboard as an example. According to the preamble, a motherboard is a component. As defendant points out, a motherboard often requires multiple connections to a power source. It insists that nothing in the patent history supports a limitation where, for example, a power supply has four DC output sockets and a user connects via component cable an optical disc drive, a sound card, and—with two cables—the motherboard. While Streak is correct that the power supply is supposed to provide DC current to at least three components, there is simply no indication that it cannot also supply power to the same component with more than one cable. Accordingly, "a plurality of

component cables" shall be construed as follows: "two or more component cables, each of which is attachable to a component selected from the group including: (a) motherboard; (b) a magnetic disc drive; (c) an optical disc drive; (d) an input/output card; (e) a memory card; (f) a sound card; (g) a gaming card; (h) a video card; (i) a network card; (j) network hub; (k) a cooling device." Because the Claim already plainly provides that the power supply must transmit current to at least three components, insertion of "different" is not warranted or necessary.

    d.  Plug (Claims One, Four, Seven) / DC output cable plug (Claims Four, Seven)

The parties agree to construe "plug" and "DC output cable plug" as "[a] DC output device which cooperates with a socket to provide a connectable, breakable electrical connection and which is attached to a relatively movable structure, such as a cable." The definition arises directly from the inventor, acting as lexicographer.

    e.  Directly mated (Claims One, Four, Seven)

The parties agreed at the hearing to construe "directly mated" as "to join or fit together."

    f.  DC output socket / DC output cable socket (Claims One, Four, Seven)

At the hearing, the parties agreed to the following construction of "socket," or "DC output cable socket": "A DC output device that cooperates with a plug to provide a connectable / breakable electrical connection, and which is attached to a relatively fixed structure, such as a housing." The definition also appears directly in the patent specification, as the inventor acted as his own lexicographer.

    B.  Indefiniteness

Alliance argues that, under any proffered construction, Claims Four and Seven are "susceptible to only one reasonable interpretation, which is nonsensical." More specifically, Alliance argues Claim Four reads such that plugs are encouraged to mate with plugs, and requires both ends of a DC output cable to be fixed to the power supply housing. Because the cable would in this embodiment not power anything at all, Alliance cites it as an example of a "nonsensical" result. As for Claim Seven, Alliance insists it suffers from the same irremediable problem that a DC output cable plug is connected at both ends to the same power supply. Streak disagrees and argues that,

NO. C 09-4255 RS
CLAIM CONSTRUCTION ORDER

when read correctly, the Claims plainly instruct that plugs should mate with sockets and explain that the DC output cable only mates once with the power supply.

According to Alliance, the plug to plug problem arises in the fifth element of Claim Four, which reads: "a plurality of component cables, wherein each of the component cables has at least two ends, wherein a first end of each of the component cables has a plug that is directly mated with a one of the at least two DC output socket[s] or the at least one DC output cable plug or cable socket and a second end of each of the component cables is directly mated with at least one of the components . . . ." Alliance reads in this language a requirement that "a component cable with a plug at the first end be directly mated with the DC output cable plug." In other words, it insists a plug would have to mate with a plug. What Alliance ignores is that the relevant portion of the claim is written in the disjunctive. As is clear from both the Claim and the Court's construction of a "plurality of component cables," a "component cable" transmits DC current from the power supply to a component. Accordingly, the last clause of element five provides that one end of a component cable is directly mated with a component (i.e., an optical disc drive or a gaming card). Claim four also makes clear that the other end of the component cable terminates in a plug. This plug can be connected directly to one of the sockets in the power supply housing itself. Claim Four is different from Claim One, of course, because it contemplates a "semi-modular" power supply. This means the "DC output cable" is permanently attached to the power supply at one end. At the other end, the DC output cable may either terminate with a plug (for direct attachment to the motherboard, as indicated in Figure 1) *or* it may terminate with a socket. In the latter scenario, the claim language contemplates that the component cable can also mate with this socket. Thus, it may mate with either one of the power supply sockets *or* the DC output cable socket.[2] It need never mate directly with a plug.

---

[2] Alliance reminds the Court that, according to the specification as well as the construction adopted here, a socket must be attached to a "relatively fixed" structure. Alliance argues a DC output cable socket would not be fixed to anything and is therefore inconsistent with the inventor's own definition of socket. While Alliance's argument is, in a sense, sensible, it erroneously assumes that a DC output cable socket cannot be "relatively fixed" to some sort of structure within the computer case.

Alliance's argument that the DC output cable must connect at both ends to the power supply is also unsupported by the plain language of both Claims Four and Seven. Alliance accurately indicates that the first element of both Claims limits the power supply to a "power supply housing having an interior volume defined by a top panel, bottom panel, and a plurality of side panels." Claims Four and Seven further require that the DC output cable be "fixed to the power supply housing." Accordingly, it is clear that the DC output cable must be attached to the power supply at one end. As is also clear in both Claims, the DC output cable can optionally terminate in a socket (or, as in Claim Seven, at least three sockets). The inventor expressly provided that a socket is attached to a "relatively fixed structure, such as a housing." Alliance insists that that "housing" must mean the "power supply housing" discussed in the first element. It is not at all clear why this would be so. First, a socket plainly need not be attached to a housing. It must be attached to a "relatively fixed structure," and "housing" is merely an example of one. Second, neither the claims nor the specification limit a "housing" to the "power supply housing." Instead, the obvious implication is that a "power supply housing" is just an example of a "housing." Claims Four and Seven may be reasonably construed without leading to ambiguous or nonsensical results and therefore are not indefinite.

## IV. Conclusion

The Court construes "personal computer power supply" as "a device that receives AC current and provides DC current to the components of a personal computer, and expressly excludes redundant power supplies, and "a plurality of component cables" as "two or more cables, each of which is attachable to a different component selected from the group including: (a) motherboard; (b) a magnetic disc drive; (c) an optical disc drive; (d) an input/output card; (e) a memory card; (f) a sound card; (g) a gaming card; (h) a video card; (i) a network card; (j) network hub; (k) a cooling device." For the reasons stated above, the constructions discussed above render neither Claim Four nor Seven indefinite.

IT IS SO ORDERED.

Dated: 10/19/10

_____
RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE